UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ROBERT ROTON and JACQUELINE §
JUAREZ, §
§
*Plaintiffs,* §
§
v. §
§       Civil Action No. 3:20-cv-3569-X
§
PEVETO FINANCIAL GROUP, LLC §
and LEGACY COUNSELING §
CENTER, INC., §
§
*Defendants.* §

## MEMORANDUM OPINION AND ORDER

Robert Roton and Jacqueline Juarez ("Plaintiffs") brought this Employee Retirement Income Security Act ("ERISA") action against Peveto Financial Group, LLC ("Peveto") and Legacy Counseling Center, Inc. ("Legacy") (collectively, "Defendants"). Before the Court are eight pending motions.

After careful consideration, and for the reasons below, the Court **GRANTS IN PART AND DENIES IN PART** Peveto's motion for judgment on the pleadings. [Doc. No. 56]. The Court **DENIES** Peveto's motion to exclude the expert testimony of Brett N. Fry [Doc. No. 34] and **GRANTS IN PART AND DENIES IN PART** Peveto's motion to exclude the expert testimony of Kathleen R. Barrow. [Doc. Nos. 33 & 38]. The Court **GRANTS** Legacy's motion for summary judgment [Doc. No. 36] and **DENIES** Peveto's motion for summary judgment. [Doc. No. 31]. The Court **DISMISSES** Peveto's motion to strike [Doc. No. 50] and **STRIKES** Plaintiffs' jury

1

demand.  Finally, the Court **DISMISSES AS MOOT** Peveto's motion for a hearing on these motions.  [Doc. No. 52].

## I. Background

Legacy has offered its employees a 403(b) plan ("the Plan") at least since 2010. A 403(b) plan—like its more popular cousin, the 401(k) plan—allows participating employees to save for their retirements on a tax-deferred basis and may also provide benefits such as employer-matching contributions.[1]  Peveto set up the 403(b) plans for Legacy's employees, which were invested in American Funds accounts.

Plaintiffs allege they "were never provided with any meaningful opportunity to participate in the [] Plan" and "were never fully apprised of [t]he Plan, its details, its tax advantages[,] and other benefits."[2]  Instead, they allege, Legacy only offered the Plan to its "high-level officers."[3]

Plaintiffs sued Legacy and Peveto, bringing two causes of action under ERISA.[4]

First, Plaintiffs seek "to recover benefits due to [them] under the terms of [their] plan, to enforce [their] rights under the terms of the plan, or to clarify [their] rights to future benefits under the terms of the plan" under 29 U.S.C. § 1132(a)(1)(B). Specifically, Plaintiffs allege "that Defendants violated ERISA by [restricting] utilization of [t]he Plan, including the lack of a written plan document and the failure

---

[1] *See* 26 U.S.C. § 403(b).

[2] Doc. No. 1 at 6.

[3] *Id.*

[4] *See* 29 C.F.R. § 2510.3-2(f) (establishing that 403(b) plans are subject to ERISA).

to comply with ERISA's universal availability requirement."[5]  To remedy this alleged violation, Plaintiffs seek "damages in the form of benefits due to Plaintiffs" and "an injunction against any act or practice which violates ERISA or the terms of [t]he Plan."[6]

Second, Plaintiffs allege breach of fiduciary duty under 29 U.S.C. § 1132(a)(2), claiming that Defendants owed "fiduciary duties arising out of their roles as sponsor, provider, administrator[,] and/or third-party administrator exercising control and/or ownership over the assets, and as trustee."[7]  Further, Plaintiffs continue, Peveto acted as a fiduciary by "exercis[ing] control and authority over the management of Plan assets" and "determining who would be eligible for [t]he Plan."[8]  And Plaintiffs conclude that Defendants breached their fiduciary duties by failing to ensure the Plan had a governing document and that it "satisfied the universal availability requirement."[9]

## II.  Analysis

### A.  Peveto's Motion for Judgment on the Pleadings

Peveto's motion for judgment on the pleadings, filed under Federal Rule of Civil Procedure 12(c), "is subject to the same standards as a motion to dismiss under Rule 12(b)(6)."[10]  The Court will "accept[] all well-pleaded facts as true and view[]

---

[5] Doc. No. 1 at 7.

[6] *Id.*

[7] *Id.*

[8] *Id.* at 7–8.

[9] *Id.* at 8.

[10] *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 209–10 (5th Cir. 2010).

those facts in the light most favorable to" Plaintiffs.[11]   Peveto's motion brings two arguments, which the Court addresses in turn.

### i.   Standing

Peveto first argues that Plaintiffs lack statutory standing to bring their claim for breach of fiduciary duty under ERISA because ERISA only permits recovery "with respect to a plan" and not for individual employees like Plaintiffs.[12]   Peveto states that the Supreme Court, in *Massachusetts Mutual Life Insurance Company v. Russell*, ruled that "Congress did not intend [ERISA's breach of fiduciary duty statute] to authorize any relief except for the plan itself" because ERISA's "draftsmen were primarily concerned with the possible misuse of plan assets" and not "with the rights of an individual beneficiary."[13]   But about twenty years later, the Supreme Court delineated *Russell*'s parameters in *LaRue v. DeWolff, Boberg & Associates, Inc.*: "*Russell*'s emphasis on protecting the 'entire plan' from fiduciary misconduct reflects the former landscape of employee benefit plans.  That landscape has changed."[14]

The new landscape the Supreme Court mapped out in *LaRue* arose when one common retirement plan gave way to another.  In the days of ERISA's enactment, and when the Supreme Court decided *Russell*, "the [defined benefit] plan was the

---

[11] *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007) (per curiam).

[12] Doc. No. 57 at 3 (cleaned up); *see* 29 U.S.C. § 1132(a)(2) ("A civil action may be brought . . . by a participant, beneficiary[,] or fiduciary for appropriate relief under section 1109 of this title[.]"); *id.* § 1109(a) ("Any person who is a fiduciary *with respect to a plan* who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good *to such [a] plan* any losses *to the plan* resulting from each such breach, and to restore *to such plan* any profits[.]" (emphases added)).

[13] Doc. No. 57 at 4 (quoting *Mass. Mut. Life. Ins. Co. v. Russell*, 473 U.S. 134, 142, 144 (1985) (emphasis omitted)).

[14] 552 U.S. 248, 254 (2008).

norm of American pension practice," but *LaRue* recognized that "[d]efined contribution plans dominate the retirement plan scene today."[15]  A 403(b) retirement plan is a "defined contribution plan"[16]—the subject of *LaRue*—which means it consists of employee or employer contributions that are invested on a participating employee's behalf.[17]  It is not a "defined benefit plan"—the subject of *Russell*—which guarantees a specified monthly payout starting at retirement.[18]  The difference between these two retirement plans can be "[o]f decisive importance"—and that is precisely the situation here.[19]

This dispute is about a 403(b) retirement plan, so *LaRue*—not *Russell*—governs the analysis.  But Peveto's motion never so much as utters the word "*LaRue*."  This omission is inexplicable given the Supreme Court's direct admonition: "[O]ur references to the 'entire plan' in *Russell* . . . are beside the point in the defined contribution context."[20]  Plaintiffs allege they were excluded from a defined contribution plan and seek to recover for individual losses resulting from Peveto's

---

[15] *Id.* (cleaned up).

[16] *See, e.g.*, *Milofsky v. Am. Airlines, Inc.*, 404 F.3d 338, 347 n.1 (5th Cir. 2005) (King, C.J., concurring) ("Examples of . . . defined contribution plans[] are 401(k) plans [and] 403(b) plans[.]").

[17] *See LaRue*, 552 U.S. at 250 n.1 ("[A] 'defined contribution plan' . . . promises the participant the value of an individual account at retirement, which is largely a function of the amounts contributed to that account and the investment performance of those contributions."); 29 U.S.C. § 1002(34).

[18] *See LaRue*, 552 U.S. at 250 n.1 ("A 'defined benefit plan[]' . . . generally promises the participant a fixed level of retirement income, which is typically based on the employee's years of service and compensation."); *id.* at 255 ("Unlike the defined contribution plan in this case, the disability plan at issue in *Russell* did not have individual accounts; it paid a fixed benefit based on a percentage of the employee's salary."); 29 U.S.C. § 1002(35).

[19] *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020); *see Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 545 (5th Cir. 2016) ("A defined-contribution plan presents a starkly different circumstance than a defined-benefit plan[.]").

[20] *LaRue*, 552 U.S. at 256.

alleged breach of fiduciary duty.  *LaRue* makes clear that they have standing to do so.  The Court **DENIES** Peveto's motion for judgment on the pleadings as to its argument that Plaintiffs lack standing.

### ii.    Extracontractual Damages

Peveto's motion next alleges that Plaintiffs impermissibly seek extracontractual damages, which are "[d]amages that would give a beneficiary more than he or she is entitled to receive under the strict terms of the plan."[21]  According to their complaint, Plaintiffs seek three categories of damages: (1) "the missed elective deferral contribution," (2) "the mandatory corrective [Internal Revenue Service ('IRS')] earnings calculation associated with such contributions," and (3) "a lost opportunity cost associated with being denied the opportunity to invest their funds in [t]he Plan," which prevented them from "realiz[ing] the market gains on such earnings."[22]  Peveto characterizes the latter two categories of damages as extracontractual and therefore barred by binding caselaw.[23]

First, Plaintiffs' request for damages according to the "corrective IRS earnings

---

[21] *Corcoran v. United HealthCare, Inc.*, 965 F.2d 1321, 1335 (5th Cir. 1992), *abrogated on other grounds as recognized in Hager v. DBG Partners, Inc.*, 903 F.3d 460 (5th Cir. 2018).

[22] Doc. No. 1 at 8–9.  Though Plaintiffs' complaint also asserts specific damages amounts for both Roton and Juarez, Peveto's motion to dismiss challenges only the *type* of damages Plaintiffs seek, not the amount.  So in deciding the motion to dismiss, the Court makes no finding as to the validity of these calculations.

[23] *See Russell*, 273 U.S. at 148 ("[T]he relevant text of ERISA, the structure of the entire statute, and its legislative history all support the conclusion that in § 409(a) Congress did not provide, and did not intend the judiciary to imply, a cause of action for extra-contractual damages caused by improper or untimely processing of benefit claims."); *Medina v. Anthem Life Ins. Co.*, 983 F.2d 29, 31 (5th Cir. 1993) ("The plain language of [section 1132(a)(1)(B)] does not mention recovery of extracontractual or punitive damages.").

calculation associated with [missed elective deferral] contributions"[24] is invalid because such damages would be extracontractual.  As Plaintiffs' response to Peveto's motion to dismiss makes clear, the "calculation" Plaintiffs invoke is derived from the Employee Plans Compliance Resolution System ("EPCRS"), a publication of the IRS that "enables employers to self-correct operational errors" in retirement plans "in order to avoid sanctions and tax consequences the IRS would otherwise be authorized to impose."[25]  This prophylactic measure is a "comprehensive system of correction programs for sponsors of retirement plans," including 403(b) plans.[26]  But the EPCRS calculations do not describe a benefit contained in the Plan, so they do not describe a benefit Plaintiffs may seek in this suit.[27]

If Plaintiffs are correct that they were improperly excluded from the Plan, then the Plan sponsor might have followed the EPCRS procedures to correct this mistake, which would have included paying Plaintiffs according to the corrective earnings calculations Plaintiffs cite.  But it did not do so, and that ship has sailed.  The corrective payment Plaintiffs demand is not a remedy guaranteed by law.  It appears in the IRS guidelines so plan sponsors can correct missed elective deferrals *before* suit

---

[24] Doc. No. 1 at 8.

[25] *In re Reinhart*, 362 F. App'x 919, 921 (10th Cir. 2010) (per curiam); *see* 29 U.S.C. § 1201a.

[26] REV. PROC. 2021-30, 2021-31 I.R.B. 172 (I.R.S. August 2, 2021) (available at 2021 WL 3033535).

[27] *See* 29 U.S.C. § 1132(a)(1)(B) (authorizing a plan beneficiary to sue "to recover benefits due to him under the terms of his plan"); *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 210 (2004) ("If a participant or beneficiary believes that benefits promised to him under the terms of the plan are not provided, he can bring suit *seeking provision of those benefits*." (emphasis added)); *see also Harzewski v. Guidant Corp.*, 489 F.3d 799, 805 (7th Cir. 2007) (holding that plaintiffs could not "sue to obtain the statutory penalty for failing to provide plan documents to a participant, since that penalty [was] not a benefit" listed in the plan).

is filed, and it serves to avoid enforcement actions like this one. Section 1132(a)(1)(B) is "the appropriate remedy" when "a beneficiary simply wants what was supposed to have been distributed under the plan."[28] That is not the case here: EPCRS remedies are not part of the Plan, so they're extracontractual. Accordingly, the Court finds that Plaintiffs are not entitled to seek such damages and **GRANTS** Peveto's motion for judgment on the pleadings as to Plaintiffs' demand for the "corrective IRS earnings calculation" for any missed elective deferrals.[29]

Guided by the same reasoning, the Court also finds invalid Plaintiffs' request for damages for "lost opportunity cost[s]" in the form of missed "market gains" on funds they would have invested in the Plan.[30] The only Plan benefits Plaintiffs describe in their complaint are elective deferral contributions, and the Court will not step beyond the complaint to assume the Plan also promised market-based returns on such contributions.[31] Plaintiffs once again cite the EPCRS to support their claim for lost opportunity costs but, as explained above, the EPCRS is irrelevant to this suit. A far more straightforward analysis is in order: The complaint does not claim that the Plan promised the benefit Plaintiffs now seek as damages, so that claim is

---

[28] *Corcoran*, 965 F.2d at 1335.

[29] Doc. No. 1 at 8.

[30] Doc. No. 1 at 8–9.

[31] Plaintiffs state that "[t]he Plan lacks a written plan document governing its material terms and conditions for . . . benefits" and that they "were never provided with a 403(b) plan opt in/opt out form that described the benefits." Doc. No. 1 at 5–6. So Plaintiffs are unable to identify the precise benefits they would have obtained under the Plan. They nevertheless allude to missing out on "[t]he Plan's deferred compensation opportunities" and claim they were "wrongfully denied an 'effective opportunity' to make elective deferrals" under the Plan. *Id.* at 6. So while the complaint plausibly alleges that the Plan offered elective deferral contributions, it includes no well-pled facts alleging that the Plan promised market-based returns as well.

extractractual.   The Court **GRANTS** Peveto's motion for judgment on the pleadings as to Plaintiffs' extracontractual demand for lost opportunity costs.

Thus, the Court **GRANTS IN PART AND DENIES IN PART** Peveto's motion for judgment on the pleadings.   The Court **DENIES** the motion as to Peveto's claim that Plaintiffs lack standing.   The Court **GRANTS** the motion as to Plaintiffs' claim for extracontractual damages in the form of the EPCRS calculation and lost opportunity costs.   Because it's too late to replead,[32] the Court **DISMISSES WITH PREJUDICE** these two categories of damages claims.

### B. Peveto's Motions to Exclude Expert Testimony

Peveto moves to exclude the expert reports of two of Plaintiffs' expert witnesses: Brett N. Fry, managing director of an investment advisory firm, and Kathleen R. Barrow, an attorney with over thirty years of experience in employee benefits and compensation.

Federal Rule of Evidence 702 governs the admissibility of testimony from a witness "qualified as an expert by knowledge, skill, experience, training, or education."[33]   Rule 702 requires that (1) the expert's knowledge will assist the trier of fact in "understand[ing] the evidence" or "determin[ing] a fact in issue," (2) "the testimony is based on sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert has reliably applied the

---

[32] *See* Doc. No. 23 at 1 ("Motions for leave to amend pleadings shall be filed by February 21, 2022." (emphasis omitted)).   Peveto filed this motion on June 10, 2022, over 3 months after the pleadings closed.   And the Plaintiffs have not met the required showing of good cause to amend their pleadings after this deadline.

[33] FED. R. EVID. 702.

principles and methods to the facts of the case."[34]  The Court must act as a gatekeeper, admitting expert testimony that is "not only relevant, but reliable."[35]  "The party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the [R]ule 702 test."[36]

Expert testimony is relevant if it helps the trier of fact "understand the evidence or [] determine a fact in issue,"[37] and it is reliable if "the reasoning or methodology underlying the testimony is scientifically valid."[38]  Such testimony must be "more than subjective belief or unsupported speculation," and the Court need not admit testimony based on indisputably wrong facts.[39]  In conducting its analysis, the Court focuses "solely on principles and methodology, not on the conclusions that they generate."[40]  And generally, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."[41]

Courts normally analyze questions of expert reliability using five nonexclusive

---

[34] *Id.* at 702(a)–(d).

[35] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *see Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("In *Daubert*, the Supreme Court instructed district courts to function as gatekeepers[.]").

[36] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

[37] *Daubert*, 509 U.S. at 591 (quoting FED. R. EVID. 702(a)).  *Daubert* further notes that the "baseline" of relevant evidence is defined in Rule 401 as "that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"  *Id.* at 587 (quoting FED. R. EVID. 401).

[38] *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 592–93).

[39] *Daubert*, 509 U.S. at 590; *see Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996).

[40] *Daubert*, 509 U.S. at 595; *see, e.g., Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153–54 (1999).

[41] *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

factors known as the *Daubert* factors.[42]  But "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."[43]

### i.   Fry

Plaintiffs designated Fry—whom they describe as "an investment professional [who] builds financial models as part of his practice in managing client portfolios"— as an expert concerning "the value of the tax[-]deferred benefit improperly denied to Plaintiffs."[44]  Fry reached his conclusions by "comparing the value of a pre-tax portfolio versus that of a post-tax portfolio, using the performance of the S&P 500 as a benchmark."[45]  Peveto makes two arguments in support of its motion to exclude Fry's testimony: (1) his calculations are unreliable because they assume Plaintiffs would have contributed the maximum allowable amount to their 403(b) accounts every year, and (2) his use of the S&P 500 led to speculative and unreliable results.[46]

In support of its first argument, Peveto offers three reasons to doubt Fry's assumption that Plaintiffs would contribute the annual maximum to their 403(b) accounts, but none are persuasive.  First, Peveto notes that Plaintiffs did not contribute the maximum allowable amounts to their other retirement accounts, so it

---

[42] The five nonexclusive *Daubert* factors are (1) whether the expert's technique can be or has been tested, (2) whether the method has been subjected to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the theory or theory has been generally accepted in the scientific community.  *Daubert*, 509 U.S. at 593–94.

[43] *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000).

[44] Doc. No. 41 at 6–7.

[45] *Id.* at 7.

[46] Doc. No. 34-1 at 4.

is unreliable to assume they would have done so to the Plan—despite sworn affidavits from each plaintiff to the contrary.[47]  This purportedly countervailing evidence—which overlooks the significant differences between personal retirement accounts and employer-sponsored plans—may be relevant to the weight of Fry's testimony, but it does not sufficiently undermine the reliability of his testimony.  Second, Peveto points to the "unusually large, indeed unreasonable, percentages" of Plaintiffs' income that would be required to make the maximum annual contribution to the Plan.[48]  Again, this fact might weigh against Fry's conclusions, but it does nothing to invalidate his methodology—based on math—or his reasoning—based on sworn affidavits.  Peveto's final attack fares no better: Plaintiffs' depositions reveal that they "did not have the excess cash, after paying for living expenses," to make the contributions Fry's calculations assumed.[49]  While perhaps a ripe point for cross-examination, again, Peveto's counter to Fry's assumption does not reveal a flaw in his methods or reasoning and thus cannot bar his testimony.[50]

Peveto's second argument for excluding Fry's testimony challenges his use of the S&P 500 to calculate hypothetical monthly returns, but this argument, too, is unavailing.  Peveto inaccurately accuses Fry of "assum[ing] that [Plaintiffs] would have put all of their contributions into an S&P growth index," but even if this were

---

[47] *Id.* at 8–11; Doc. No. 41 at 9, 12.

[48] Doc. No. 34-1 at 9.

[49] *Id.* at 10.

[50] *See, e.g.*, *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Fry's approach, it is not so unreasonable as to warrant exclusion.[51]  Like other expert reports that the Court has declined to strike in ERISA disputes, Fry's report "thoroughly explains the method he used to reach his opinion," and his use of the S&P 500 as a growth benchmark "is not subjective belief or unsupported speculation."[52] Again, Peveto's argument fails to strike at Fry's methods or reasoning; instead, it merely critiques one assumption behind his well-reasoned conclusion.  This amounts to a question of weight, not admissibility, so it does not merit exclusion.

Fry's report is relevant, and his conclusions are reliable.  Peveto's arguments for exclusion bear entirely on the weight a factfinder ought to afford Fry's conclusions, while failing to subvert their admissibility.  Because Peveto presents no genuine reason to question the reliability of Fry's testimony, the Court **DENIES** Peveto's motion to exclude his expert testimony.

### ii.    Barrow

Plaintiffs retained Barrow "to render an opinion on the standard of care associated with" Legacy and Peveto, and her report concludes that both are fiduciaries and that both breached their duties to Plaintiffs.[53]  Specifically, Barrow's report offers the following conclusions:

- Both Legacy and Peveto were fiduciaries.
- There is no evidence of a plan document.  This is a breach of the standard of care including a breach of fiduciary duty on behalf of both fiduciaries.
- The 403(b) Plan at issue is required to be "universally available" to

---

[51] Doc. No. 34-1 at 12.

[52] *Fracalossi v. MoneyGram Pension Plan*, No. 17-cv-336-X, 2021 WL 5505604, at *14 (N.D. Tex. Nov. 24, 2021) (Starr, J.).

[53] Doc. No. 46 at 2.

all eligible employees.
- Legacy and Peveto breached the standard of care, including their fiduciary duty to the plaintiffs, by:
  - failing to make the plan "universally available" to all employees,
  - discriminating in favor of highly compensated employees,
  - failing to give plaintiffs a yearly opportunity to participate in the 403(b) Plan, and
  - failing to protect the tax-qualified status of The 403(b) Plan[.][54]

Federal Rule of Evidence 704(a) states that "[a]n opinion is not objectionable just because it embraces an ultimate issue," but the Fifth Circuit has made clear that "this rule does not allow an expert to render conclusions of law."[55] Nor may an expert "provide opinions on legal issues."[56] This is because "our legal system reserves to the trial judge the role of deciding the law for the benefit of the jury."[57] "[A]llowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant."[58] Experts often avoid these restrictions by discussing industry standards (a factual matter where expert testimony is often helpful) rather than legal duties (a question of law for the court).[59]

ERISA gives specific legal guidance for determining who qualifies as a "fiduciary" to a plan.[60] Plaintiffs filed suit under a statute that states: "Any person

---

[54] Doc. No. 46-2 at 10 (cleaned up).

[55] FED. R. EVID. 704(a); *Snap-Drape, Inc. v. C.I.R.*, 98 F.3d 194, 198 (5th Cir. 1996).

[56] *Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020).

[57] *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997).

[58] *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983).

[59] *See Flanagan v. City of Dallas*, No. 3:13-CV-4231-M-BK, 2017 WL 2817424, at *1 (N.D. Tex. May 25, 2017) ("Qualified experts are permitted to offer opinion testimony as to industry standards or norms and whether or not they were followed in a particular case, as long as such opinions involve questions of fact rather than purely legal matters." (Toliver, M.J.) (citing *Waco Int'l, Inc. v. KHK Scaffolding Houston, Inc.*, 278 F.3d 523, 533 (5th Cir. 2002))).

[60] 29 U.S.C. § 1002(21)(A).

who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach."[61]   In other words, Defendants' liability under this section depends on whether they are fiduciaries and, if so, whether they breached their fiduciary duties to Plaintiffs.  Barrow expressly concluded that yes, they were, and yes, they did.  The former conclusion is legal and the latter is factual.  Both are problematic. The Court finds that Barrow's report impermissibly offers conclusions of law and opinions on ultimate legal issues, and that the rest of her report's conclusions are factual, and thus are improper for an expert witness.  Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** Peveto's motion.  The Court grants Peveto's motion to exclude Barrow's testimony at trial but denies the motion to exclude her expert report.  The Court will consider Barrow's report in the nature of an *amicus* brief and give her conclusions the weight they are due.[62]

## C. Legacy's Motion for Summary Judgment

Legacy moves for summary judgment on the basis that the Plan is exempt from ERISA under a statutory "safe harbor" provision.  For the reasons below, the Court agrees with Legacy.

---

[61] 29 U.S.C. § 1109(a).

[62] *See In re Reliant Energy ERISA Litig.*, No. H-02-2051, 2005 WL 5989791, at *2 (S.D. Tex. Aug. 19, 2005) ("[A] Court sitting as the trier of fact may find expert testimony on complex legal issues such as the ERISA issues in this case very helpful and, therefore, may consider those opinions . . . [a]kin to its consideration of an *amicus* brief.").

"Standard summary judgment rules control in ERISA cases."[63]  A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[64] "[F]actual [disputes] are considered in the light most favorable to the nonmovant," and "[t]he substantive law will identify which facts are material."[65]  If the moving party satisfies its burden, the nonmoving party "must set forth specific facts showing that there is a genuine [dispute] for trial."[66]

ERISA's requirements "appl[y] to any employee benefit plan if it is established or maintained by an employer."[67]  Faced with uncertainty as to whether 403(b) plans fit this definition, the Department of Labor created a "safe harbor" provision, which exempts 403(b) plans from ERISA requirements if they meet four criteria:

> (1) Participation is completely voluntary for employees;
> (2) All rights under the annuity contract or custodial account are enforceable solely by the employee . . . ;
> (3) The sole involvement of the employer . . . is limited to . . . :
> > . . .
> > (vii) After February 6, 1978, limiting the funding media or products available to employees, or the annuity contractors who may approach employees, to a number and selection which is designed to afford employees a *reasonable choice* in light of all relevant circumstances. Relevant circumstances may include, but would not necessarily be limited to, the following types of factors:
> > > (A) The number of employees affected,

---

[63] *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014) (cleaned up).

[64] FED. R. CIV. PROC. 56(a).

[65] *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996) (cleaned up).

[66] *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968) (cleaned up).

[67] *Memorial Hosp. Sys. v. Northbrook Life. Ins. Co.*, 904 F.2d 236, 240 (5th Cir. 1990) (citing 29 U.S.C. § 1003(a)); *see* 29 U.S.C. § 1002(2)(A)(i) (defining "employee pension benefit plan" as "any plan, fund, or program . . . established or maintained by an employer . . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program . . . provides retirement income to employees").

(B) The number of contractors who have indicated interest in approaching employees,

(C) The variety of available products,

(D) The terms of the available arrangements,

(E) The administrative burdens and costs to the employer, and

(F) The possible interference with employee performance resulting from direct solicitation by contractors; and

(4) The employer receives no direct or indirect consideration or compensation in cash or otherwise other than reasonable compensation to cover expenses properly and actually incurred by such employer in the performance of the employer's duties pursuant to the salary reduction agreements or agreements to forego salary increases described in this paragraph[.][68]

Legacy argues that the Plan is moored in the safe harbor because it satisfies all four statutory requirements. So, Legacy contends, the Plan is not "established or maintained by an employer" and therefore not subject to ERISA requirements.[69] Legacy cites evidence showing the Plan's compliance with each of the factors, but Plaintiffs only challenge one. They pinpoint the phrase "reasonable choice" in section 2510.3-2(f)(3)(vii), asserting that Legacy cannot shelter in the safe harbor because it fails to comply with this phrase.

To show why the Plan fails to offer a "reasonable choice," Plaintiffs urge the Court to look beyond the factors listed in section 2510.3-2(f)(3)(vii)(A)–(F) and to consider Field Assistance Bulletin Number 2010-01 (the "Bulletin"), which the Department of Labor issued in February of 2010.[70] The Bulletin's "Coverage Questions and Answers" section asks: "Must a 'safe harbor arrangement' under 29 CFR 2510.3-2(f) offer participants a reasonable choice of both 403(b) providers and

---

[68] 29 C.F.R. § 2510.3-2(f)(1)–(4) (emphasis added).

[69] Doc. No. 36-1 at 12.

[70] Doc. No. 44 at 12.

investment products?"[71]  The answer: "Yes.  To meet the terms of the safe harbor, the arrangement generally must offer a choice of more than one 403(b) contractor and more than one investment product."[72]  While exhorting the Court that the Bulletin "should receive 'substantial deference'" under *Auer* and is "entitled to respect" under *Skidmore*, Plaintiffs nevertheless concede that "such opinion letters and enforcement guidelines are not precedent."[73]  Relying on the Bulletin, Plaintiffs argue that Legacy is disqualified from safe-harbor protection because it only offered one contractor (Peveto) and one product (American Funds).[74]

"Whatever deference may be due to the Department's informally promulgated Bulletin," the Court declines to defer to this supplementary publication in lieu of a clear textual analysis.[75]  The statute says that the third safe harbor element is satisfied if the extent of the employer's involvement is limiting the products *or* the contractors available to employees—not both, as the Bulletin says.[76]  And while Legacy limited its employees to one contractor, Peveto, the evidence shows they had

---

[71] Robert J. Doyle, *Field Assistance Bulletin No. 2010-01*, U.S. DEP'T OF LABOR (last visited Dec. 15, 2022), https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2010-01.

[72] *Id.*

[73] Doc. No. 44 at 14 (first citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); and then citing *Auer v. Robinson*, 519 U.S. 452, 461–63 (1997)).

[74] *Id.*

[75] *Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393, 401 (5th Cir. 2010) (en banc).

[76] 29 C.F.R. § 2510.3-2(f)(3)(vii) ("The sole involvement of the employer . . . is limited to . . . limiting the funding media or products available to employees, *or* the annuity contractors who may approach employees, to a number and selection which is designed to afford employees a reasonable choice in light of all relevant circumstances[.]" (emphasis added)).

multiple American Funds options to select from.[77]  So Legacy did not provide a choice of contractors, but it did provide a choice of products.   Under the unambiguous statutory language, that satisfies the third safe harbor element.[78]

Legacy points to persuasive, uncontradicted evidence showing it satisfies each factor required for the safe-harbor provision: (1) participation in the Plan was completely optional and voluntary for each Legacy employee;[79] (2) all rights under the Plan were enforceable solely by the Legacy employee;[80] (3) the extent of Legacy's involvement was limiting the available products to afford employees a reasonable

---

[77] Doc. No. 36-2 at 48–49 (deposition of Jacqueline Juarez, answering "[y]es" to the question "when you enrolled did you have a choice of funds, a menu to choose from?"); *id.* at 54 (Jacqueline Juarez's 403(b) enrollment form with American Funds, which included eight blank lines on which to designate a "[f]und name or number" and instructed enrollees to visit an online guide "[f]or a quick guide to fund names, numbers, minimums[,] and share class restrictions"). Plaintiffs argue that Clark Peveto's deposition testimony proves there was no reasonable choice of products because when he was asked whether "Peveto Financial offered any other product besides American Funds" he answered "[n]o." Doc. No. 44-1 at 13.  But just a few questions prior, when asked whether "Peveto Financial offers American Funds *products*," he answered "yes." *Id.* (emphasis added).  So Peveto agreed that American Funds was the only "mutual fund company" available to Legacy employees, and he agreed with the use of the word "product" to describe American Funds as a company. *Id.*  But he also testified that American Funds itself offers multiple "products," which Peveto made available to Legacy employees. *Id.*  Plaintiffs urge the Court to interpret Peveto's testimony as evidence that American Funds is a product that sells products, but the Court—consistent with Peveto's actual words and common sense—views American Funds as a mutual fund company that sells products.

[78] Because the statute is unambiguous, deference under *Auer* is unwarranted. *Forrest General Hospital v. Azar*, 926 F.3d 221, 230 (5th Cir. 2019) (concluding statutory interpretation by noting that "the statute[] is unambiguous, making *Auer* deference inappropriate").  And the Court declines Peveto's request to defer to the Bulletin based on *Skidmore* deference.  *See U.S. v. Mead Corp.*, 533 U.S. 218, 250 (2001) (Scalia, J., dissenting) ("[T]he rule of *Skidmore* deference is an empty truism and a trifling statement of the obvious[.]"); *Moore v. Hannon Food Serv., Inc.*, 317 F.3d 489, 497 n.14 (5th Cir. 2003) ("Ultimately, *Skidmore* analysis is of limited value in interpreting regulations, given that it stops short of requiring deference[.]").

[79] Doc. No. 36-2 at 4 (affidavit of Melissa Grove, Legacy's executive director, stating that "[p]articipation in the 403(b) retirement account was a completely optional and voluntary act on the part[] of each employee").

[80] Doc. No. 31-2 at 4–5 (affidavit of Clark Peveto, Peveto's sole member and manager, stating that Legacy employees opened 403(b) accounts with Capital Bank & Trust, Inc., which were "individually owned and controlled by the employee participant" who could "choose any financial consultant he or she wishe[d] or none at all" and exercised "ultimate decision making authority in regard to his or her investments").

choice;[81] and (4) Legacy did not receive direct or indirect compensation beyond reasonable expenses to cover its costs.[82]   Plaintiffs offer no argument to refute Legacy's evidence showing the Plan satisfies each of the four safe-harbor requirements.[83]

The Court finds that the Plan is anchored within the statutory safe harbor. The Plan is thus exempt from ERISA's requirements, so the Court **GRANTS** Legacy's motion for summary judgment.

### D. Peveto's Motion for Summary Judgment

Peveto seeks summary judgment "on all claims asserted . . . by Plaintiffs" on two grounds: (1) Peveto "is not a fiduciary to the [] Plan under the controlling ERISA regulations and case law," and (2) Peveto's "duty to Plaintiffs, if any, was limited to rendering investment advice and Peveto [] did not breach such a duty."[84]   The Court finds that the evidence, viewed in the light most favorable to Plaintiffs, presents a genuine dispute of material fact as to both of Peveto's claims.

"Fiduciary duties under ERISA are derived from statute and the common law

---

[81] Doc. No. 36-2 at 4 (Grove affidavit, stating that "[t]he only actions ever taken by Legacy related to the 403(b) retirement account was to provide relevant paperwork, direct employees interested in participating in the 403(b) retirement account to Peveto Financial, withhold money from payroll as directed by employees for the 403(b) retirement account, and forward the amounts withheld to the investment provider").

[82] *Id.* (Grove affidavit, stating that "Legacy Counseling Center is not paid any fee whatsoever from the 403(b) retirement account, from Peveto, or from any of the investment providers for the 403(b) retirement account").

[83] Plaintiffs argue that the Court should consider the expert testimony of Kathleen Barrow, who offered the conclusion that the Plan is subject to ERISA, but as noted above, Barrow's testimony is inadmissible precisely because it offers such legal conclusions.

[84] Doc. No. 31-1 at 7, 26.

of trusts.  They include the duties of loyalty and care to ERISA plan beneficiaries."[85]
In relevant part, ERISA defines "fiduciary" as one who, with respect to a retirement
plan, "exercises any discretionary authority or discretionary control respecting
management," "renders investment advice for a fee or other compensation, direct or
indirect, with respect to any moneys or other property of such plan," or "has any
discretionary authority or discretionary responsibility in the administration of such
plan."[86]  In short, "Congress commodiously imposed fiduciary standards on persons
whose actions affect the amount of benefits retirement plan participants will
receive."[87]

Peveto stringently maintains that it "has not exercised discretionary authority
or control over the [Plan] or the employees' investments."[88]  But the evidence—which
largely unfolds in dueling affidavits from Clark Peveto, the sole member and manager
of Peveto, and Melissa Grove, the executive director of Legacy—establishes a genuine
dispute over this key point.

Concerning the initiation of the Plan, Grove states that Peveto "set up a 403(b)
retirement account to be offered to all employees of Legacy," and Peveto concedes that
Grove "opened a 403(b) account through Peveto Financial."[89]  Peveto acknowledges
"Ms. Grove's account and the individual 403(b) accounts for the other Legacy

---

[85] *Fracalossi*, 2021 WL 5505604, at *8.

[86] 29 U.S.C. § 1002(21)(A).

[87] *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993).

[88] Doc. No. 31-1 at 14 (emphasis omitted).

[89] Doc. Nos. 43 at 4–6; 31-2 at 4.

employees, which we have opened," but adds that they "are individually owned and controlled by the employee participant."[90]  Grove, meanwhile, explains that "[i]t was Legacy's understanding that Peveto [] would handle and control all necessary issues related to the management of the 403(b) retirement account."[91]

Concerning investments, Peveto says each Legacy employee "has the ultimate decision making authority in regard to his or her investment[]," but Grove adds that "[o]nce directed to Peveto [], employees would be provided with a choice of investment options from American Funds and would be provided with information on plan investments options."[92]  The affidavits agree on one fact: Peveto provided a "group presentation" and some individual meetings with Legacy employees, which included discussions of "their investment objectives" and "the opportunities of the 403(b) retirement account."[93]  Peveto's presentation and one-on-one meetings resulted in some Legacy employees (either "two" or "[s]everal") opening 403(b) accounts.[94]  Peveto claims it "has not exercised discretionary authority with respect to the purchase or sale of mutual funds in a 403(b) plan account of a Legacy employee" but admits it "will make investment recommendations to the individual 403(b) participants upon

---

[90] Doc. No. 31-2 at 4–5.

[91] Doc. No. 43 at 5.

[92] Doc. Nos. 31-2 at 5; 43 at 5.

[93] Doc. Nos. 31-2 at 5; 43 at 6; *see* Doc. No. 43 at 15, 22 (documenting the presentation by "the designated broker/administrator" of the Plan, which included "one-on-one consults regarding individualized fund selections" and covered the following topics: "What is the 403 B Retirement Plan and how [can] employees [] contribute?"; "The Pros and Cons of participating in a 403 B Retirement plan;" "Investment Options;" and "Enrollment").

[94] Doc. Nos. 31-2 at 5; 43 at 6.

request."[95]  And while Peveto says it's not on Legacy's payroll, it does "collect[] a percentage of the sales fee charged by the American Funds whenever an employee purchases a mutual fund."[96]

Finally, concerning administration, Peveto avers it "does not offer administrative services for ERISA plans," and Grove responds in kind that "Legacy never provided any administrative services"—but Grove adds that Legacy "relied on companies like Peveto . . . to provide the administration services required for a 403(b) retirement account."[97]  Faced with these competing narratives, it is difficult to know which party was initiating, administering, authorizing, and managing Legacy's 403(b) accounts, and which party is now trying to shirk responsibility.

While the outcome of Peveto and Legacy's game of high-stakes hot potato is perhaps inconclusive, at the summary-judgment stage, that doesn't bode well for Peveto.  The Court must view the evidence in the light most favorable to the nonmoving party, and that light illuminates several disputes of material fact.  Peveto disclaims all discretionary responsibility for administering or managing the Plan, but Legacy views Peveto as the Plan's chief administrator and manager.  Peveto says that all discretionary investment authority lies with the employees, but Legacy says Peveto presents the investment options for employees to pick from.[98]  And Peveto

---

[95] Doc. No. 31-2 at 6.

[96] Doc. No. 31-1 at 10.

[97] Doc. Nos. 31-2 at 5; 43 at 6.

[98] Peveto cites the Fifth Circuit's reasoning in *Schloegel v. Boswell*, which held that a party was not a fiduciary when he "made an investment *proposal*, not an investment decision."  994 F.2d 266, 272 (5th Cir. 1993).  But in that case, a different party had testified "that he made the ultimate decision to purchase" the policy at issue.  *Id.*  Here, in contrast, the only other plausible fiduciary,

23

claims the employees completely control their own accounts, but Legacy directs any employee interested in the Plan straight to Peveto for investment information and enrollment services. These disputed facts are material because Peveto's fiduciary status hinges on its discretionary authority and administrative responsibility.

Peveto also admits to a couple key facts that indicate its status as a fiduciary. Peveto provided Legacy and its employees with the Plan enrollment forms.[99] It offered investment recommendations to Plan participants and received compensation (albeit indirectly) when they signed up.[100] It gave a presentation about investing and enrollment followed by one-on-one investment consultations.[101] And it, not Legacy, opened the 403(b) account of each and every employee who joined. None of these admissions guarantees Peveto's status as a fiduciary, but that is not required at the summary-judgment stage. Instead, Peveto bears the burden to prove by a preponderance of the evidence that it is *not* a fiduciary.

Taken together, these disputed and undisputed facts could persuade a

---

Legacy, not only stringently denies any authority over the Plan, but also points to Peveto as the Plan's prime administrator and manager.

[99] Doc. No. 43 at 21.

[100] Peveto analogizes its commission payments to a payment scheme the Fifth Circuit found did not establish a fiduciary relationship. Doc. No. 31-1 at 17 (citing *Am. Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc. of the U.S.*, 841 F.2d 658, 664 (5th Cir. 1998)). Although that third-party commission did not constitute a fee sufficient to make the recipient an ERISA fiduciary, in that case, the Fifth Circuit's reasoning relied on the fact that the plan administrator gave investment advice "*before* [he] assumed his fiduciary duties." *Am. Fed'n of Unions*, 841 F.2d at 664 (emphasis added). That reasoning is inapplicable here because Peveto offered investment advice simultaneously with its alleged fiduciary duties.

[101] This activity could be viewed as elevating Peveto from "render[ing] investment advice merely as an incident to [its] broker-dealer activities" to "plac[ing] [itself] in a position of trust and confidence as to [its] customers," which, according to the Fifth Circuit, is enough to establish a fiduciary relationship under ERISA. *Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 375 (5th Cir. 2018) (cleaned up).

reasonable factfinder that Peveto "exercises [] discretionary authority . . . respecting management" of the Plan, that it "renders investment advice for a fee or other compensation, direct or indirect," or that it "has any . . . discretionary responsibility in the administration" of the Plan.[102]  In other words, viewing the evidence in a light most favorable to Plaintiffs, Peveto is not entitled to judgment as a matter of law on the question of its status as a fiduciary.

Peveto next argues that even if it was a fiduciary, it did not breach any fiduciary duties to Plaintiffs.  ERISA states that "a person is a fiduciary with respect to a plan *to the extent*" he acts according to the statutory definition.[103]  Based on this language, Peveto argues that the specific fiduciary duties Plaintiffs allege Peveto breached are beyond the extent of Peveto's alleged discretionary acts.  Again, the parties present conflicting evidence, and again, the evidence raises a genuine dispute of material fact as to whether Peveto breached its alleged fiduciary duty.

Plaintiffs allege that Peveto breached its fiduciary duty by violating the "universal availability rule," which holds that "if any employee is given the opportunity to participate in a Section 403(b) plan, then all employees (with limited exceptions) must similarly be given the opportunity to participate."[104]  Specifically, Plaintiffs allege Peveto failed to inform them of the Plan's existence and failed to "ensur[e] that [t]he Plan was written by a governing plan document," which restricted

---

[102] 29 U.S.C. § 1002(21)(A).

[103] *Id.* (emphasis added).

[104] Doc. No. 1 at 3; *see* 26 U.S.C. § 403(b)(12)(A)(ii).

their access to it.[105]   Relying on Grove's testimony that Legacy considered Peveto to be the Plan's administrator and Peveto oversaw all Plan enrollment, Plaintiffs charge Peveto with the responsibility of providing a summary plan description to all participants and beneficiaries.[106]   Since Plaintiffs were unaware of the Plan due in part to the "lack of a written plan document," they allege that Peveto's failure to create one constitutes a breach of fiduciary duty.[107]

In response, Peveto argues that the universal availability rule applies only to employers, so, because Peveto was merely a "financial consultant," it had no obligation to comply.[108]   But Peveto cites no authority to support its claim that only employers must abide by the universal availability rule.   Peveto emphasizes all the managerial acts it *didn't* do and all the employment tasks it *didn't* undertake, while minimizing all the evidence pointing to its administrative functions relative to the Plan.   But Peveto agreed with Grove's testimony that Peveto enrolled all Legacy employees in the Plan and presented the Plan to those employees.   And Grove testified that Legacy believed Peveto to be in control of the Plan and all management duties, including "disclosures to the employees" and "reporting requirements."[109] Were Peveto a fiduciary, the universal availability rule would have obligated it to promulgate the Plan to Legacy employees, whether by written publication or some

---

[105] Doc. No. 1 at 8.

[106] *See* 29 U.S.C. § 1022(a) ("A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries . . . .").

[107] Doc. No. 1 at 7.

[108] Doc. No. 31-1 at 23.

[109] Doc. No. 43 at 11.

other means.  There is evidence that Peveto failed to do so.

To the extent Peveto was an ERISA fiduciary under the Plan, a factual dispute exists concerning whether it breached its fiduciary duties by failing to abide by the universal availability rule.

Finding that a genuine dispute of material fact exists as to whether Peveto was an ERISA fiduciary and, if so, whether it breached its fiduciary duty to Plaintiffs, the Court **DENIES** Peveto's motion for summary judgment.

### E.  Peveto's Motion to Strike Jury Demand

Finally, Peveto moves to strike Plaintiffs' jury demand under Rule 12(f). Because Plaintiffs' claim for monetary restitution is intertwined with various equitable claims, the Court finds that Plaintiffs are not entitled to a jury trial.

The Fifth Circuit has made clear "that ERISA claims do not entitle a plaintiff to a jury trial."[110]  "The Seventh Amendment [] appl[ies] to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies . . . ."[111]  "To determine whether a particular action will resolve legal rights," the Supreme Court has "examine[d] both the nature of the issues involved and the remedy sought."[112]

"Generally, an action for money damages was 'the traditional form of relief offered in the courts of law.'"[113]  But the Supreme Court has not held that "any award

---

[110] *Borst v. Chevron Corp.*, 36 F.3d 1308, 1324 (5th Cir. 1994) (collecting cases); *see Calamia v. Spivey*, 632 F.2d 1235, 1237 (5th Cir. 1980).

[111] *Curtis v. Loether*, 415 U.S. 189, 194 (1974).

[112] *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990).

[113] *Id.* at 570 (cleaned up).

of monetary relief must necessarily be 'legal' relief."[114]   In fact, "a request for monetary recovery sounds in equity, and thus does not guarantee a jury trial, when it is restitutionary in nature or is intertwined with claims for injunctive relief."[115]

Plaintiffs seek to "enforce rights under the terms of" the Plan, to "clarify rights to future benefits," and to impose "an injunction against any act or practice which violates ERISA or the terms of [t]he Plan."[116]   These equitable claims are intertwined with the Plaintiffs' monetary claims, which are restitutionary in nature because Plaintiffs seek "to recover benefits due to them" under the Plan.[117]   Plaintiffs' response to Peveto's motion focuses on Plaintiffs' monetary claims while ignoring their intertwined equitable claims, and it relies almost exclusively on non-binding or irrelevant caselaw.[118]   The Court disagrees with Plaintiffs' claim that the damages sought are wholly "legal in nature, not equitable,"[119] and agrees with Peveto that Plaintiffs are not entitled to a jury trial on their intertwined equitable and legal

---

[114] *Curtis*, 415 U.S. at 196.

[115] *Borst*, 36 F.3d at 1324.

[116] Doc. No. 1 at 6–7.

[117] Doc. No. 1 at 6.

[118] Plaintiffs assert that "[t]wo Supreme Court cases have made clear that claims by participants and beneficiaries under ERISA seeking to recover money based on wrongful benefit denials are legal rather than equitable in nature," but the two cases Plaintiffs cite say no such thing. Doc. No. 54 at 2.  Instead, the first makes clear that "restitution is a legal remedy when ordered in a case at law and an equitable remedy . . . when ordered in an equity case," and instructs that "whether it is legal or equitable depends on 'the basis for [the plaintiff's] claim' and the nature of the underlying remedies sought."  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) (cleaned up). Because Plaintiffs seek restitution and because the underlying nature of at least some of the remedies they seek is equitable, this case cuts against their claim that they are entitled to a jury because they seek a legal remedy.  And Plaintiffs' second Supreme Court case states that "ERISA provides for equitable remedies to enforce plan terms," which again cuts against Plaintiffs' claim that seeking monetary benefits under the Plan's terms ensures their claim is legal, not equitable.  *Sereboff v. Mid Atlantic Med. Servs., Inc.*, 547 U.S. 356, 363 (2006) (emphasis omitted).

[119] Doc. No. 54 at 3–4.

claims.   The Court **DISMISSES** Peveto's motion and **STRIKES** Plaintiffs' jury demand.[120]

### III. Conclusion

The Court **GRANTS IN PART AND DENIES IN PART** Peveto's motion for judgment on the pleadings.  [Doc. No. 56].  The Court **DENIES** Peveto's motion to exclude the expert testimony of Brett N. Fry [Doc. No. 34] and **GRANTS** Peveto's motion to exclude the expert testimony of Kathleen R. Barrow.  [Doc. Nos. 33 & 38]. The Court **GRANTS** Legacy's motion for summary judgment [Doc. No. 36] and **DENIES** Peveto's motion for summary judgment.   [Doc. No. 31].   The Court **DISMISSES** Peveto's motion to strike [Doc. No. 50] and **STRIKES** Plaintiffs' jury demand.  Finally, the Court **DISMISSES AS MOOT** Peveto's motion for a hearing on these motions.  [Doc. No. 52].

**IT IS SO ORDERED** this 29th day of December, 2022.

_____

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[120] Doc. No. 50-1 at 4.  Peveto's motion was untimely filed.  Rule 12(f) authorizes a court to strike material from a pleading either "on its own" or "on motion made by a party either or before responding to the pleading, if a response is not allowed, within 21 days after being served with the pleading."  FED. R. CIV. PROC. 12(f)(1)–(2).  Peveto filed its answer to the Plaintiffs' complaint on February 10, 2021, and its motion to strike on May 11, 2022.  Doc. Nos. 22, 50.  Its motion to strike material from the complaint was therefore untimely filed under Rule 12(f).  However, Rule 12(f) authorizes a court to strike material from pleadings "on its own," and the Court will do so here.